UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Sivakumar Periasamy

*Plaintiff*,

v.

Texas Veterinary Medical
Diagnostic Laboratory and Texas A&M
System,

*Defendants.*

CIVIL ACTION NO. 4;21-cv-21-1303

JURY TRIAL REQUESTED

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, Sivakumar Periasamy ("Plaintiff"), files his Second Amended Complaint against Texas Veterinary Medical Diagnostic Laboratory (TVMDL) and Texas A&M University System (collectively referred to as "TVMDL") and states:

### SUMMARY

1. This is a race/color discrimination, national origin discrimination, and retaliation case under Title VII of the 1964 and 1991 Civil Rights Act (Title VII) based on (a) the termination of Plaintiff's employment because of his race, color, and national origin [Asian/Brown/Indian] and (b) retaliation TVMDL engaged in after Plaintiff lodged a complaint of discrimination and a hostile work environment based on his race and national origin to TVMDL management. Shortly thereafter, Defendants terminated Plaintiff's employment.

-1-

2. Accordingly, Plaintiff lodges race/color discrimination, national origin discrimination, and retaliation claims under Title VII because his race, color, national origin, and Defendants' retaliatory treatment were motivating factors in his disparate treatment, hostile work environment, and termination from employment.

3. Given TVMDL's violations of Title VII, Plaintiff is entitled to make whole relief, including, without limitation, back pay, front pay, compensatory damages, and punitive damages.

## JURISDICTION

4. This Court has jurisdiction over Plaintiff's claims under the Court's federal question jurisdiction, namely, Title VII and 28 U.S.C. §1331.

## VENUE

5. Venue is proper under 28 USC U.S.C. § 1391(a), (b) (1-2), and (e) in the United States District Court for the Southern District of Texas because TVMDL and its subsidiary entities are located within this Court's jurisdiction – Brazos County.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff filed a charge of discrimination with the EEOC on March 6, 2020, alleging a continuing violation of race, color, and national origin discrimination in violation of Title VII. Plaintiff also alleged that TVMDL terminated his employment based on (a) Title VII discrimination violations and (b) retaliation against him for engaging in protected activity under Title VII. Thereafter, the EEOC issued a Right to Sue Letter on February 5, 2021. Thus, this lawsuit is timely filed under Title VII

## SERVICE OF PROCESS

7. Texas A&M System has a registered agent for service of process in Austin, Texas, located at Capitol Corporate Services, Inc; 211 East 7th Street #620, Austin, TX 78701. Based on Federal Rule of Civil Procedure 4, Plaintiff has effectuated service of process upon the System's registered agent in Texas through Mach V., a process server over 18 years of age.

8. In turn, Texas Veterinary Medical Diagnostic Laboratory has a registered agent for service of process in Austin, Texas, located at Capitol Corporate Services, Inc; 211 East 7th Street #620, Austin, TX 78701. Based on Federal Rule of Civil Procedure 4, Plaintiff has effectuated service of process upon TVMDL's registered agent in Texas through Mach V., a process server over 18 years of age.

## PARTIES

9. Plaintiff is a current resident of Dickinson, Texas; he is an American with a national origin and race of Asian-Indian descent entitled to protection under the provisions of Title VII. Plaintiff was employed as a Section Head of Virology at TVMDL during his employment with TVMDL and he always resided in Brazos County relevant to the events recited in this Complaint.

10. With its headquarters located in College Station, Texas, TVMDL is a research system located in the Southern District of Texas. TVMDL's main campus is in College Station, Texas, and its address for the university is Box 40001 College Station, 77842-4001, Suite 1601-TAMU, College Station, Texas 77843-0200. TVMDL was Plaintiff's "employer" within the meaning of Title VII. Moreover, both Defendants in this case were joint employers, joint Defendants, or part of a joint single employer enterprise under Title VII.

## FACTUAL ALLEGATIONS

11. TVMDL, through TVMDL's Director, Mr. Bruce Akey, hired Plaintiff Dr. Sivakumar Periasamy as the College Station Virology Section Head on September 9, 2019.

12. Plaintiff is a well-educated scientist with several degrees, including BVSc (Batchelor of Veterinary Science) and a PhD in Veterinary Pathology and Microbiology. Plaintiff's field of interest is Academia, and he specializes in the areas of Virology and Bacteriology/Mycology (infectious diseases). He is also a diplomate with the American College of Veterinary Microbiologists.

13. In July 2019, Plaintiff accepted a position as Section Head of Virology at TVMDL. As stated in TVMDL's offer letter that Mr. Akey provided to Plaintiff, his annual base salary was $117,700, and he began work in September 2019.

14. After a few weeks working for TVMDL, his colleagues, Ms. Amy Swinford (Associate Director), Ms. Pamela Ferro (Section Head of Molecular Diagnostics), and Ms. Vanessa Andrews (Assistant Section Head of Virology), exhibited animosity toward Plaintiff because of his race, color, and national origin. Plaintiff was born in India, is Asian, and has light brown skin. He has an Indian accent that is noticeable when spoken. On multiple occasions, Plaintiff experienced discriminatory behavior from these women. For example, Plaintiff sent a draft of research grant to Mr. Akey and Ms. Swinford, and she was angry and told Plaintiff that he was not allowed to write a grant even though research activity was part of his job. Further, Ms. Ferro stopped attending the weekly meetings with the Plaintiff and the Associate Director, Ms. Andrews, instructed the lab technicians not to listen the Plaintiff, who was the Section Head.

-4-

In separate one-on-one meetings with Ms. Ferro and Ms. Andrews, they informed Plaintiff that he could not write a research grant. Moreover, Ms. Andrews never showed any interest to teach Plaintiff the TVMDL lab technicalities clearly and adequately. Indeed, Ms. Swinford insisted that the Plaintiff should confer with Vanessa Andrews for anything related to lab matters. Swinford, Andrews and Ferro did not treat Plaintiff fairly as a Section Head who had adequate technical and subject knowledge for the job.

15. On information and belief, Ms. Swinford, Ms. Ferro, and Ms. Andrews were born in the United States and they are all white. Their skin is much lighter than Plaintiff's. Unlike Plaintiff, they do not speak with an Indian accent.

16. All three women—Ms. Swinford, Ms. Ferro, and Ms. Andrew—are close friends, and have worked at TVMDL for more than 10 years. Indeed, these women did not want a man of Plaintiff's race, color, and national origin to be injected into their work environment. In his first complaint to Ms. Swinford (on 11/1/2019), Plaintiff told Ms. Swinford that Ms. Andrews/Ms. Ferro and lab members were not treating him fairly. To be sure, Plaintiff made several attempts to create a good relationship with them, but his attempts were unavailing.

17. Plaintiff reported directly to Ms. Swinford.

18. Ms. Ferro was considered Plaintiff's equivalent in terms of their job duties and positions. Ms. Ferro did not like being considered Plaintiff's equivalent because she previously held the position of Section Head of Molecular Diagnostics and Virology, which was later split into two independent sections. Plaintiff was hired to supervise the Virology section, while Ms. Ferro was placed in charge of the Molecular Diagnostic section. When Plaintiff was hired as the Section Head of Virology, Defendants reduced Ms. Ferro's job duties and responsibilities and her job title changed to Section Head of Molecular Diagnostics. To be sure, Ms. Ferro could not

understand that a man of Plaintiff's race, color, and national origin had taken over some of her job duties and responsibilities, and she let this be known through her frequent, inappropriate conduct toward Plaintiff. For instance, she dishonestly made complaints against the Plaintiff to the Associate Director that (i) Plaintiff gave misleading instructions to the lab technicians while observing the tests; (ii) Plaintiff lacks the technical knowledge; (iii) Plaintiff was not speaking to technicians but staring at them; and (iv) Plaintiff was not asking questions to technicians and interacting with them. Ms. Ferro also spied on Plaintiff without his knowledge and took photos/videos when Plaintiff was working with the lab computers. Consequently, Ms. Ferro expected Plaintiff to serve as her subordinate by maintaining that she was the Section Head of the combined Virology and Molecular Diagnostics for many years.

19. In turn, TVMDL expected Ms. Andrews, as the Assistant Section Head, to be a subordinate to Plaintiff's role as Section Head of Virology. But Ms. Andrews did not want to report to Plaintiff because of his race, color, and national origin. She displayed utter disdain for Plaintiff through her facial expressions towards Plaintiff on a near daily basis. She also instructed the lab technicians (Ms. Sommer VanHook and Ms. Samantha Winkler) not to listen to Plaintiff when he was in the lab. Plainly, Ms. Andrews engaged in an orchestrated plan—along with Ms. Ferro and Ms. Swinford—to run Plaintiff out of his position as quickly as possible.

20. For example, during the first week of Plaintiff's job, Bruce Akey (Director of TVMDL), asked all Section Heads to prepare research grant proposals. This is a very important task because it generates funding for research projects at TVMDL. Therefore, understanding the importance of this role, and following the direction from Mr. Akey, Plaintiff prepared and

submitted a draft research grant proposal to Mr. Akey, Ms. Swinford, and Ms. Ferro, on the fourth week of his employment.

21. Ms. Swinford chastised Plaintiff for preparing the draft research grant proposal. She told Plaintiff that it was not his job as Section Head of Virology to perform any research-related tasks. When meeting with the Director, Ms. Swinford told the Director that Plaintiff should not be allowed to write a grant proposal.

22. Nevertheless, the Section Head of Virology at TVMDL—Amarillo (Kiril Dimitrov), a Caucasian from Bulgaria, could prepare and submit a draft research grant proposal. Mr. Dimitrov joined TVMDL-Amarillo just two or three weeks before Plaintiff joined at the College Station lab. Indeed, TVMDL management praised Dimitrov for successfully doing so and published a news segment on their website.

23. By contrast, Ms. Swinford (likely with influence by/from Ms. Ferro) essentially stripped Plaintiff of his research job duties and engaged in discriminatory conduct toward Plaintiff because of his race, color, and national origin. Ms. Swinford's statements regarding Plaintiff's job duties are a pretext for discrimination because: (i) Mr. Akey asked *all* Section Heads to prepare the research grant proposals, and Plaintiff was a Section Head; (ii) Plaintiff's job description clearly reveals that research is an important part of Plaintiff's role; (iii) Plaintiff's training plan clearly shows that research is a component of Plaintiff's position; and (iv) a Section Head of Virology (a light-skinned Caucasian (Mr. Dimitrov), who is not from India and who works at a different laboratory [TVMDL-Amarillo], was permitted to prepare and submit a research grant proposal.

24. After Ms. Swinford stripped Plaintiff of his research duties, she instructed Ms. Ferro and Ms. Andrews to scrutinize Plaintiff's work activity in the laboratory. This, in turn, only

emboldened Ms. Ferro and Ms. Andrews to further their discriminatory agenda against Plaintiff. This also created a suffocating environment for Plaintiff to perform his duties in the laboratory and office.

25. During his employment, Plaintiff's authority was undermined by Ms. Swinford, Ms. Ferro and Ms. Andrews on a consistent basis by telling Lab Technicians that Plaintiff lacked knowledge regarding laboratory procedures and protocols. This created significant problems for Plaintiff because, in his role as Section Head of Virology, he was expected to monitor laboratory procedures and protocols and evaluate the work performance of the Lab Technicians. Plaintiff was highly qualified to perform these duties. Ms. Andrews, however, told the Lab Technicians that they should not listen to Plaintiff's instructions. Despite Plaintiff's role as a Section Leader, he was not allowed to instruct or have discussions with Lab Technicians. When Plaintiff spoke with the Lab Technicians, Ms. Andrews would follow up with them about Plaintiff's discussion, and conveyed it to Ms. Ferro and Ms. Swinford. Moreover, Ms. Andrews dishonestly lodged a complaint against Plaintiff that he was giving instructions to the lab technicians while performing tests. On several occasions, Plaintiff did not agree with this and other complaints made by Ms. Swinford. Further, Ms. Swinford did not ask Ms. Andrews or Ms. Ferro to treat the Plaintiff respectfully. Ms. Swinford told Plaintiff to "shut [his] mouth" and silently observe the test procedures in the lab.

26. When Plaintiff attempted to make recommendations to Lab Technicians on how they could improve their faulty techniques, the Lab Technicians would be dismissive of Plaintiff's critiques. On several occasions, Plaintiff had corrected the testing procedures. The Lab Technicians would not have made any such complaints but for Ms. Ferro and Ms. Andrews

undermining Plaintiff's authority by speaking negatively about him to the Lab Technicians. Again, Ms. Swinford, Ms. Ferro, and Ms. Andrews took these actions—which created a hostile work environment for Plaintiff – because they did not want a man of Plaintiff's race, color, and national origin in that position.

27. In attempting to further sabotage Plaintiff's work performance, Ms. Andrews consistently failed to respond to Plaintiff's request for test samples or emails. In one instance, her failure to respond to Plaintiff's request delayed Plaintiff's attempt to submit the Proficiency Test plan to QA or Quality Assurance manager.

28. Accordingly, Plaintiff complained to Ms. Swinford and Human Resources about the hostile work environment around the sixth week of his employment with TVMDL. This created more problems for Plaintiff inside the lab. Ms. Andrews and Ms. Ferro alienated the Plaintiff further from lab technicians and falsely lodged complaints against him to Ms. Swinford at frequent intervals. As far as Plaintiff was aware, TVMDL did not investigate his complaints. Likewise, TVMDL did not take any remedial action to prevent the harassing conduct from recurring.

29. About two weeks after Plaintiff engaged in protected activity by complaining of the hostile work environment, Ms. Swinford retaliated against Plaintiff by giving him a negative work evaluation ("2-month evaluation"). Specifically, she gave Plaintiff a score of "1" out of a possible "5."

30. Ms. Swinford's negative comments on the evaluation form were biased and revealed inconsistent treatment of Plaintiff compared to similarly situated employees. For example, she wrote: "There is currently a strained relationship between Siva and his section staff, particularly between him and the assistant section head." Ms. Andrews is the Assistant Section

Head. The strained relationship, if any, was caused by Ms. Andrews' utter disdain for Plaintiff since the first day Plaintiff began working at TVMDL. And Ms. Andrews and Ms. Ferro consistently undermined Plaintiff's authority, thereby causing the alleged friction, if any, between Plaintiff and his staff members.

31.  As another example, Ms. Swinford wrote, "he [Plaintiff] has chosen to attend meetings not directly related to his position over getting into the lab and learning from his staff." This criticism is a pretext for discrimination and retaliation because Ms. Swinford knew Plaintiff was attending the referenced meetings which she specifically authorized Plaintiff to do so. These meetings were all about infectious diseases of animals that are the major focus of the TVMDL and the Plaintiff's job.

32.  Additionally, Ms. Swinford wrote:

> "Dr. Periasamy was observed on 11/14/19 to be instructing the technicians to vortex samples in the rack, instead of vertexing individual samples as per the SOP, after I specifically told him not to give technicians conflicting instructions."

> "I consider this incident to be tantamount to insubordination for not following my directive. I expect this behavior to cease immediately. ... Continued failure to meet expectations could result in additional disciplinary actions, up to and including termination."

33.  In response to these allegations, Plaintiff explained to Ms. Swinford that she was relying on a completely fabricated story from Ms. Ferro and Ms. Andrews about what happened that day. After Ms. Swinford investigated the matter, she agreed with Plaintiff and completely removed the above-quoted passage from his work evaluation.

34.  Unfortunately, Ms. Ferro and Ms. Andrews' efforts to sabotage Plaintiff did not stop.

35. During Plaintiff's Competency Test, either Ms. Ferro or Ms. Andrews switched one of Plaintiff's samples to cause him to generate a false reading of "negative" when the reading was supposed to be "positive." Plaintiff is extremely confident in his abilities to generate proper readings, so he insisted that both Ms. Ferro and Ms. Andrews watch him retest the sample. Ms. Andrews observed Plaintiff's technique, and she could not identify any flaw in Plaintiff's technique. Nevertheless, the test still generated a "negative" reading when the reading was supposed to be "positive." Plaintiff knew that something was wrong, and he suspected that they had switched the samples. Thus, Plaintiff asked Ms. Ferro and Ms. Andrews to retest the same sample in the presence of Plaintiff to see what result they generated. They both froze up and refused to test the sample in Plaintiff's presence, even though the test takes only about an hour.

36. The next day, Ms. Ferro and Ms. Andrews decided to retest the same sample—outside of Plaintiff's presence. They tested the sample and showed Plaintiff the positive reading at the end of the test. At this point, Plaintiff knew that their hatred of him was so intense that they were willing to take extreme measures to get rid of him, even if it meant destroying his career. In response to Plaintiff's EEOC complaint, TVMDL management changed their opinion and toned down the result as 'weak positive' for the above-mentioned sample, which they strongly considered as 'positive' until they terminated the Plaintiff's employment. This categorically explains the sabotaging behavior of Ms. Ferro and Ms. Andrews directed to Plaintiff.

37. Plaintiff performed several competency tests as part of his training, but Ms. Swinford and Ms. Ferro neither approved them nor gave a proper explanation for their failure to do so. It was an intentional act to sabotage Plaintiff's work performance. They never discussed or expressed concerns about Plaintiff's lab testing skills with scientific facts.

38. Ms. Swinford asked the QA (Quality Assurance) Manager to create a Corrective Action Plan for Plaintiff because he did not timely submit a Proficiency Test Plan. But Ms. Swinford did not order a Corrective Action Plan for Mr. Paul Narayan (Section Head Bacteriology/Mycology - Asian), who also failed to timely submit a Proficiency Test Plan. Plainly, Ms. Swinford treated Plaintiff less favorably than Caucasian employees, including Mr. Narayan, because Plaintiff had previously engaged in protected activity by complaining about the unfair discriminatory treatment and the hostile work environment to which Defendants imposed upon him.

39. On January 3, 2020, Ms. Swinford terminated Plaintiff's employment. The only reason she provided was "performance." Ms. Swinford's articulated reason is false and unworthy of credence. She treated Plaintiff unfairly as compared to others; she relied on fabricated and trumped-up allegations from those who also bore discriminatory animus towards Plaintiff, and she chastised him for engaging in activities that were approved (such as attending a meeting) or specifically requested (such as grant writing). Plaintiff doubts whether Ms. Swinford, who is an Associate Director, had the authority to issue an employment termination letter. Further, she did not give Plaintiff an opportunity to meet the Director (Mr. Akey), who was on vacation at the time of Plaintiff's employment termination.

As Plaintiff believed, after experiencing hardships at work, Ms. Swinford and Ms. Ferro devised a plan to bring M. Kiril Dimitrov (a Caucasian, Section Head of Virology at TVMD-|Amarillo) to TVMDL-College station to replace Plaintiff. Ms. Ferro has known Mr. Dimitrov for many years, as he did some work at TVMDL in the past. Their plan was to first terminate the Plaintiff and then bring Mr. Dimitrov to College Station to replace him. To do so, they devised a circuitous way that no one could imagine. After terminating the Plaintiff, they decided to move

Mr. Owais Khan (the Section Head of Bacteriology & Serology at TVDLM-Amarillo) to Mr. Dimitrov's position. Then, they decided to move Mr. Dimitrov to College Station. Later, they wanted to fill the Bacteriology & Serology Section Head at TVMDL-Amarillo, for which they received an open application. After the Plaintiff filed an EEOC complaint, they abruptly stopped the hiring process for this position, but they moved Mr. Dimitrov to College Station. This activity clearly emphasizes that Ms. Ferro and Ms. Swinford did not want the Plaintiff in that position.

## COUNT ONE
### TITLE VII—RACE, HOSTILE WORK ENVIRONMENT, AND NATIONAL ORIGIN DISCRIMINATION CLAIMS

40. Plaintiff lodges his race discrimination, hostile work environment, and retaliation claims under Title VII. TVMDL management, based on the factual allegations in this First Amended Complaint, treated Plaintiff less favorably than his white American coworkers and retaliated again him, namely, by issuing him discriminatory performance evaluations and terminating his employment under the pretext of "performance." TVMDL terminated Plaintiff's employment because of his race, color, and national origin. These illegal factors were motivating factors in Defendants' employment decisions in violation of Title VII.

## COUNT TWO
### RETALIATION UNDER TITLE VII

41. TVMDL's employment decisions plainly constitute retaliation based on Plaintiff's discrimination complaint lodged before he was terminated from employment. To be sure, the temporal proximity between the internal complaint and Plaintiff's termination from employment supports a reasonable finding of retaliation against Plaintiff. Additionally, the facts recited in this First Amended Complaint, taken as a whole, support a retaliation finding under Title VII.

## JURY DEMAND AND REQUEST FOR RELIEF

42. TVMDL is liable to Plaintiff based on his employment termination because of race discrimination, color discrimination, national origin discrimination, and retaliation under Title VII. Therefore, Plaintiff is entitled to the following relief:

    A. Back pay, including benefits;

    B. Front pay, including benefits;

    C. Pre- and post-judgment interest;

    D. Compensatory damages;

    D. Punitive damages;

    E. Attorneys' fees;

    F. Costs of these proceedings; and

    G. Injunctive relief enjoining Defendants from interfering with Plaintiff's efforts to obtain future employment and enjoining and permanently restraining their violations of Title VII.

43. **Plaintiff requests a trial by jury.**

44. Plaintiff reserves his right to supplement and amend this First Amended Complaint

upon the discovery of additional facts.

Respectfully submitted,

By: /s/ Dean J. Schaner
Dean J. Schaner
Texas Bar No. 17726500
S.D. No. 12457
Schaner Law Firm PLLC
5313 Pocahontas St.
Bellaire, Texas 77401
Telephone: 832-548-1478
deanschaner@schanerlawfirm.com
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on August 9, 2022, this document was served by email and CM/ECF upon lead counsel for Defendants, namely, Taylor Gifford, Office of the Attorney General, P.O. Box12548 MC-019; Austin, TX 78711-2548; Tel: 512-463-2120; Email: taylor.gifford@oag.texas.gov

/s/Dean Schaner
Dean J. Schaner